Roger **SJOLUND**, Plaintiff–Appellee,

v.

Peter K. **MUSLAND**, Norsol, Inc., and Wink Corporation, Defendants–Appellants.

Appeal No. 87–1496.

United States Court of Appeals, Federal Circuit.

June 1, 1988.

Thomas Cline, Seattle, Wash., for plaintiff-appellee.

Michael W. Bocianowski, Christensen, O'Connor, Johnson & Kindness, Seattle, Wash., for defendants-appellants.

Before RICH and SMITH, Circuit Judges, and NICHOLS, Senior Circuit Judge.

RICH, Circuit Judge.

This appeal is from the District Court for the Western District of Washington. This suit for patent infringement was tried to a jury and, by agreement of the parties, presided over by a magistrate. Defendants Peter K. Musland, Norsol, Inc., and Wink Corporation appeal from the judgment entered on the jury's verdict, holding them liable for infringing Roger Sjolund's (Sjolund) U.S. Patent No. 4,221,071 ('071) on an improved crab trap, awarding damages, and enjoining defendants from further acts of infringement. We reverse the judgment because we conclude that the magistrate erred in denying defendants' motion for judgment notwithstanding the verdict (JNOV) that the claims in suit are invalid for obviousness under 35 U.S.C. § 103.

## BACKGROUND

### *The Claimed Invention*

The '071 patent defines three improvements on a conventional king crab trap. The first improvement is intended to prevent crabs from escaping a trap once having entered it. Crab fisherman found that as a trap became crowded with crabs piled one on top of the other, many crabs were able to leave the trap by crawling up a side face of the entrance tunnel to the upper surface of the tunnel, and from there out through the entrance frame and out through the entrance frame and out the tunnel to the ocean floor. Sjolund's solution to this problem was to add triangular baffles in the upper corners of the trap, extending from the upper surfaces of the entrance tunnels to the top face of the trap, to prevent crabs from crawling from the side faces of an entrance tunnel onto its upper surface. Claim 1 defines this improvement and is in Jepson form. The lengthy preamble describes a conventional crab trap and then the body of the claim defines the improvement, which comprises

a pair of baffles mounted between opposite edges of said entrance frame and spaced apart locations on said lateral face to block said escape route thereby preventing crabs from escaping from said trap.

It is clear from the preamble that the "lateral face" is one of the faces which defines the mouth of an entrance tunnel. We note that the claim is drafted in terms of a trap having *an* "entrance frame" and "a pair of baffles." It reads equally well on traps in actual use, which typically have two entrance frames and two pairs of baffles. The parties variously refer to the baffles as "anti-escape baffles" and "tanner fences."

Crab traps are often used to trap crab species of different sizes, and the second improvement of the '071 patent is designed to facilitate the conversion of the trap from one species to another. The patent specification states that king and tanner crabs are the most heavily fished species in Alaskan waters, and that of the two, the tanner crab is substantially the smaller. Thus, the tanner crab may escape easily through the large mesh in the escapement panel of the standard trap. To convert the trap to tanner crab fishing, panels of a smaller mesh size are secured over the escapement panel. Thus, claim 16 reads (paragraphing ours):

16. In a crab trap of the type having an outline of a right rectangular prism formed by four lateral faces of netting extending between a pair of bases covered by netting to form an enclosure, the mesh of the netting covering said bases and all but one [of] said lateral faces being of a first size and the mesh of the netting covering the remaining lateral

face being of a second, substantially larger size, the improvement comprising a plurality of net panels having a mesh of said first size, said panels being releasably secured to each other and to said enclosure across said remaining lateral face so that said trap may be easily converted from a trap for one species of crab to a trap for a different species of crab.

Appropriately enough, the parties refer to these net panels as "tanner panels."

The third improvement of the '071 patent permits the entrance frame opening of the trap to be partially closed when the trap is used for tanner crab fishing. This is accomplished through the use of a long rectangular board or panel placed parallel to the entrance frame opening and pivotable about one of its long edges, so that in at least one position the board partially blocks the entrance opening. This feature is found, for example, in dependent claim 13 (paragraphing ours):

13. The crab trap of claim 1 further including means for varying the width of the entrance opening formed by said entrance frame, comprising

a generally elongated panel having one of its longitudinal edges pivotally secured to said trap about an elongated edge of said entrance frame such that said panel may be pivoted toward said entrance frame to a partially closed position or away from said entrance frame to a full open position.

The parties variously refer to the "elongated panel" of claim 13 as a "tanner board" or a "lattice board."

Sjolund asserted infringement of claims 7–10, 13, and 16–19. As set forth immediately above, the subject matter of dependent claim 13 is the combination of a conventional crab trap with anti-escape baffles and a tanner board. Claims 7–10 omit the tanner board, but add the element of a

plurality of tanner panels, in various stages of refinement. Thus, the subject matter of these claims is the combination of a crab trap with anti-escape baffles and a plurality of tanner panels. Claim 16 is an independent claim to a conventional trap in combination with a plurality of tanner panels. Claims 17–19 depend from claim 16 and add the same refinements to the tanner panel arrangement as are found in claims 8–10.

### The Jury Instruction and "Special Verdict" on Obviousness[*]

The jury was asked to decide the question of obviousness. The magistrate instructed the jury as follows:

Defendants claim that plaintiff's patent is invalid for the reason that the inventions contained in the patent were "obvious." An invention is obvious if the differences between it and the prior art are such that the invention as a whole would have been obvious at the time it was made to a person having ordinary skill in the art to which the invention pertains. Defendants must prove obviousness by clear and convincing evidence.

These factors have primary relevance to the issue of obviousness:

1. The scope and content of the prior art. The "prior art" includes inventions already in existence and publicly known.

2. The differences between the prior art and the claims of the plaintiff's patent.

3. The ordinary skill level of a person in the art of the claimed invention.

These factors have secondary relevance to the issue of obviousness: the commercial success of the invention; the existence of a long-felt need that was met by the invention; the length of time during which the problem, if any, solved by the invention remained unsolved; and

---

[*] We have explained elsewhere that when the legal question of obviousness is submitted to the jury, it is technically improper to characterize that question as a special verdict under Fed.R. Civ.P. 49(a), because Rule 49(a) only provides for the submission of *fact* questions to the jury. *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1516, 220 USPQ 929, 938 (Fed.Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); *see also Quaker City Gear Works v. Skil Corp.,* 747 F.2d 1446, 1453, 223 USPQ 1161, 1165–66 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1136, 105 S.Ct. 2676, 86 L.Ed.2d 694 (1985).

the failure of others who attempted to solve the problem addressed by the invention.

After being instructed on the law, the jury responded to the following question on obviousness:

## OBVIOUSNESS

2. Have defendants proved, by clear and convincing evidence, that the inventions described in the following claims of the patent were "obvious"?

Answer YES or NO with regard to each claim.

ANSWER:

| Claim 7 | NO | Claim 16 | NO |
|---|---|---|---|
| Claim 8 | NO | Claim 17 | NO |
| Claim 9 | NO | Claim 18 | NO |
| Claim 10 | NO | Claim 19 | NO |
| Claim 13 | NO | | |

If your answer to this question is "yes" as to one or more claims of the patent, you need not answer any of the other questions as to such claims.

As indicated with regard to each claim in suit, the jury responded that defendants had not carried their burden of proving obviousness.

### Motion for JNOV

The jury's responses to all of the questions on the special verdict form were favorable to Sjolund, and a judgment was entered in his favor on July 1, 1987. On July 14, defendants filed their motion for JNOV on the ground, inter alia, that the claims in suit were invalid for obviousness. The motion was denied that same day without opinion.

### Standard of Review

The standard to be applied in reviewing a denial of a motion for JNOV is a common procedural question not specifically provided for in any statute or rule. Since our decision in *Panduit Corp. v. All States Plastics Mfg. Co.,* 744 F.2d 1564, 223 USPQ 465 (Fed.Cir.1984) (*per curiam*), our practice has been to apply the discernable law of the forum to procedural issues not unique to patent law. Thus, we look to the decisions of the Court of Appeals for the Ninth Circuit to identify our standard of review.

That standard is expressed in *Peterson v. Kennedy,* 771 F.2d 1244 (9th Cir.1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). The court explained:

We review the propriety of a JNOV under the same standard that is applied by the district court. A JNOV is proper when the evidence permits only one reasonable conclusion as to the verdict. We view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. A JNOV is improper if reasonable minds could differ over the verdict.

*Peterson v. Kennedy,* 771 F.2d at 1252 (citations omitted); *see also Venegas v. Wagner,* 831 F.2d 1514, 1517 (9th Cir.1987); *Rinker v. County of Napa,* 831 F.2d 829, 831 (9th Cir.1987). Denial of a JNOV is inappropriate and must be reversed when it is clear that the evidence and its inferences cannot reasonably support judgment in favor of the opposing party. *Pierce v. Southern Pacific Transportation Co.,* 823 F.2d 1366, 1369 (9th Cir.1987); *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1014 (9th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). The Ninth Circuit has also recognized that where a jury is asked to decide a question of law which depends on underlying factual determinations, the jury's legal conclusion is subject to independent review by the court on appeal. *Oahu Gas Service, Inc. v. Pacific Resources Inc.,* 838 F.2d 360 (9th Cir.1988).

## ANALYSIS

### (a) The Prior Art

It was uncontroverted that many relevant devices were old and the jury must have accepted their status as prior art. The first of these devices is the conventional king crab trap. The description of the prior art in the '071 patent states that "[c]onventional crab traps have been used in their present form for many years." This same trap is defined in the preamble of claim 1, which is a Jepson claim. Since

the preamble of a Jepson claim is impliedly admitted to be prior art, see *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315, 227 USPQ 766, 770 (Fed.Cir.1985); *Reading & Bates Construction Co. v. Baker Energy Resources Corp.*, 748 F.2d 645, 649–50, 223 USPQ 1168, 1172 (Fed.Cir. 1984); *In re Ehrreich*, 590 F.2d 902, 909–910, 200 USPQ 504, 510 (CCPA 1979), and the specification confirms this implied admission, the jury must have accepted the conventional trap as prior art, as a matter of law.

The combination of a conventional trap with tanner boards of various sorts was also well known prior to Sjolund's invention. The description of the prior art in the '071 patent discusses two types, albeit in language which is at times obscure. Roger Sjolund testified that the "Johnson board" or "V–board" is described in the following passage of the specification as a "baffle plate":

Attempts have been made to improve the yield of conventional crab traps by preventing crabs from leaving the trap. However, all such attempts have focused on preventing the crab from exiting through the entrance frame. This approach has met with little success since these structures have the effect of deterring crabs from entering. In one of these approaches a baffle plate angles upwardly from the longitudinal edge of the rectangular opening closest to the end of the trap. The plate does not prevent the crabs from entering the trap since its inner end is spaced a sufficient distance above the opening. However, an escaping crab crawling along the inner surface of the second panel crawls along the upper surface of the plate and falls off its inner edge back into the trap.

Moreover, the Johnson board or V–board is shown in Fig. 13 of the patent. The "board" is actually made of a rectangular sheet of rigid plastic which is heated and bent along its long axis, so that the finished board appears as a "V" in cross-section. The specification states that an installed Johnson board is pivotable about its long axis. While the above quotation from the specification discusses only that portion of the board defined by one leg of the "V", a later passage makes clear that the portion of the board defining the second leg of the "V" is used to "reduce[ ] the width of the opening formed by the entrance frame."

Aside from the Johnson board, it was well known to use a simple wooden board to restrict the width of the entrance opening. Again, this is stated in the description of the prior art in the specification:

At present, the opening formed by the entrance frame is usually narrowed by securing a board to the frame along one longitudinal edge of the frame, typically by using large rubber bands.

Sjolund testified that when he first visited crab fishermen to learn something about crab traps and with an eye to improving them, the use of the wooden boards was one of the first things he noticed:

Q. And did these fishermen express to you any needs that they faced in their industry?

A. ... I would say, "What are these tanner boards for on a pot?"

They would say, well, you've got to restrict the opening size from the standard nine, nine and a half inch king crab size down to I think it was four and a half inches.

And they would explain to me why they put boards in. They used actual wooden one-by-fours. That was one of the first things that caught my eye.

Sjolund testified along the same vein with regard to the Johnson board. As a matter of law, the jury must have accepted the Johnson board and the wooden board as prior art.

Tanner panels also were known in the prior art. Again, a description is found in the '071 patent itself:

The relatively large mesh netting covering the escapement end of the trap is normally converted to a smaller mesh by either of two conventionally used techniques. The simplest technique is to simply tie a net over the escapement end of the trap. The second technique is to mount a rectangular frame having a

smaller mesh over the escapement end of the trap. The principal disadvantage of the last mentioned technique is the need to buy, store and carry various size frames to fit various size crab traps. Sjolund referred to the first technique as sewing a "hanger" or "curtain" into the trap. In the second method, the frame-and-net arrangement is simply referred to as a "tanner panel." As in the case of the Johnson board and the wooden tanner board, we think the jury was obligated to accept the framed tanner panel and the curtain as prior art, as a matter of law.

There was also evidence, introduced by defendants, of a prior art device relevant to the anti-escape baffles of the '071 patent. In this regard, defendants relied on the testimony of Captain Leif Nordbo of the fishing boat Flying Cloud. Nordbo testified that in 1978 for his account, defendant Peter Musland built 500 crab traps into which were sewn, to Nordbo's specification, pieces of netting or webbing at the same spot as the anti-escape baffles claimed in the '071 patent. Nordbo testified that he paid Musland three dollars apiece for the sewn-in nettings. Four pages of undated, allegedly contemporaneous sketches were introduced into evidence in support of Nordbo's testimony. The first three, Nordbo testified, were his illustrations of how he wanted his traps constructed to include the new piece of netting and other features. Nordbo testified he did not draw the fourth sketch, which showed the bridle end of a crab trap, below which the notation "2 small T. PANELS" appeared. Another notation, "TANNER FENCE," appeared above a small line drawing in a lower corner of the paper, which could be interpreted as a depiction of a piece of netting sewn in at the same location where Sjolund placed his baffles. The invoices for the traps were also introduced into evidence. It appears that the first invoice became so crowded with notes and figures that a second was drawn up. At the bottom of the second invoice, the "Remarks" section is filled with handwritten notations. The final notation, set in parentheses, reads "SPECIAL TANNER FENCE AS PER SKETCH NORDBO, PRICED @

TIME AND MATERIAL." A check stub for a down payment on the traps was similarly introduced, but there was no evidence of any final payment which reflected a charge for the "tanner fences."

Peter Musland's testimony tended to corroborate that of Leif Nordbo. Musland testified that it was Nordbo who originally suggested the idea of installing what Musland referred to as tanner fences, and that he built 500 pots for Nordbo with tanner fences made of nylon netting, sewn in with nylon twine. And according to Musland, it was he who explained the concept of the tanner fences to Sjolund:

Q. And did you tell Mr. Sjolund about this fence idea?

A. Yes.

Q. Did you ever show him a pot with a net sewn into it for a crab fence?

A. That I can't remember. I did take him out and point it out to him where this part had to go, from one corner to the other end and up the other corner and down, and showed him in the pot exactly where it had to be and how it had to function.

While Musland had an obvious incentive to testify as he did, the fact that Nordbo had no demonstrated financial interest in the outcome of the suit supports the trustworthiness of his testimony. The contemporaneous business records also tend to confirm this version of the facts. *Cf. Corona Cord Tire Co. v. Dovan Chemical Corp.*, 276 U.S. 358, 381–82, 48 S.Ct. 380, 387, 72 L.Ed. 610 (1928). Nonetheless, oral testimony to establish the existence of allegedly anticipatory devices has long been viewed with skepticism. *See, e.g., The Barbed Wire Patent Case*, 143 U.S. 275, 284–85, 12 S.Ct. 443, 447, 36 L.Ed. 154 (1892); 1 D. Chisum, *Patents* § 3.05[2][c] (1987). If this were the only evidence, a reasonable jury could certainly have found that prior knowledge or use of the tanner fences was not proven by clear and convincing evidence.

There was, however, further evidence to corroborate prior public knowledge or use of the tanner fences—evidence which a rea-

sonable jury could not freely disregard. This was the testimony of the inventor, Roger Sjolund. Sjolund plainly admitted on cross-examination that the concept of a device to block the path of crabs onto the upper surface of the entrance tunnel was not the product of his own mind, but was revealed to him by Peter Musland:

Q. Do you recall Pete [Musland] ever showing you on a crab pot out in the yard at his place a piece of netting sewn in in a triangular shape in the corner of the pot?

A. Yes.

Q. He did show you that?

A. If he didn't show me netting, he showed me where they would net that triangular piece in, yes.

Given Sjolund's admission, substantial evidence supports only one finding, namely, that tanner fences, in the form of nylon netting, were known or used by others prior to the date of Sjolund's invention.

Thus, we conclude that the jury must have accepted five devices as prior art: (1) the conventional crab trap; (2) the "Johnson" or "V" tanner board; (3) the wooden tanner board; (4) the steel frame and net tanner panel; and (5) the nylon net tanner fences. In so doing, we have heeded the statutory presumption of validity, which fixes on the challenger the burden of proving, by clear and convincing evidence, the facts necessary to support a legal determination of invalidity. *See* 35 U.S.C. § 282. As to the existence and nature of the above five items, defendants have met this burden. The jury was not at liberty to disbelieve the evidence which established these devices as prior art. To put it another way, the evidence permits only one reasonable conclusion with respect to the existence and nature of these devices. *See Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1387 (9th Cir.) (affirming grant of directed verdict in favor of the party having the burden of proof, on an issue where only one conclusion could be drawn from the undisputed evidence), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984); *accord Aggarwal v. Ponce School of Medi-*

*cine*, 837 F.2d 17, 20 (1st Cir.1988) (party having burden of persuasion can prevail on motion for JNOV only if that party presents testimony the jury is not at liberty to disbelieve); *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir. 1984) (affirming grant of directed verdict for plaintiff where the plaintiff established his case by evidence that the jury was not at liberty to disbelieve). Here, the first four devices are described in the '071 patent as already known, and their existence is uncontroverted. The proof of the fifth device, the tanner fences, was of a different nature. The inventor's own admission, nowhere denied, qualified, or controverted, convinces us that a reasonable jury could only find that tanner fences were known in the prior art. Compare *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 220 USPQ 193 (Fed.Cir.1983), in which a jury ignored several key prior art references in returning a verdict for the patent owner. This court, in affirming a grant of JNOV for the defendant, held that the jury was not free to disregard those references. *Connell*, 722 F.2d at 1550, 220 USPQ at 199–200. We reach the same conclusion here.

### (b) Differences Between the Claimed Invention and the Prior Art

The determination of the differences between the claimed invention and the prior art is a factual one. In this case, however, the differences were not disputed. Rather, the parties disagreed on the proper construction of the claims and the effect this would have on the determination of the legal questions of the obviousness of the claimed inventions. The significance of this disagreement will become clear as this opinion proceeds.

### (i) Claims 7–10

As discussed earlier, the subject matter of claim 7 is a conventional crab trap in combination with anti-escape baffles and a plurality of tanner panels. One difference between the invention and what was old is immediately apparent: claim 7 of the '071 patent claims a "plurality" of panels—that is to say, more than one—whereas the old

practice was to use a single framed panel. A second difference a reasonable jury could conceivably have found is that while the art showed on the one hand traps using a tanner panel, and on the other traps using tanner fences of nylon netting, there was no conclusive evidence that the combination of all three elements was found in any one trap. These, we believe, are the only differences a reasonable jury could have found if it did not commit any legal errors in construing claim 7. Some differences are apparent in multiple dependent claims 8–10, which specify design features of the panels—for example, that the panels have a rigid rectangular frame with a crossmember and that the panels have interconnecting tabs.

### (ii) Claim 13

Claim 13 incorporates the anti-escape baffles of claim 1, as well as the tanner board. There was testimony that wooden tanner boards were typically removed from the trap when not in use, whereas Sjolund's board, as specified in claim 13, may be pivoted on its axis to an out-of-the-way position. Thus, the jury could reasonably have found one difference between Sjolund's tanner board and the wooden board to be that the wooden board was not pivotable in the same manner as Sjolund's board. But as to the Johnson or V–board, a reasonable jury construing the claims in a legally permissible way could only find that there are no differences between the Johnson board and the tanner board of claim 13.

### (iii) Claims 16–19

Claims 16–19 are identical to claims 7–10, except that claims 16–19 omit the anti-escape baffles. Thus, claim 16 is directed to a crab trap having a plurality of tanner panels. As in the case of claim 7, one difference the jury could reasonably have found between claim 16 and the prior art is that claim 16 refers to a plurality of tanner panels, whereas the old practice was to use a single panel. And, as in the case of claims 8–10, claims 17–19 introduce minor differences in terms of design features, e.g., that the panels are constructed on a rigid frame having a crossmember and that

the panels may be connected by means of interlocking tabs. Taken together, these are the differences we believe a reasonable jury could have found between the subject matter of claims 16–19 and the prior art.

### (c) Legal Analysis on Obviousness

Even assuming that the jury settled on a minimal level of skill in the art, we conclude that the magistrate erred in failing to grant JNOV. Since obviousness is a question of law, see *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1566–68, 1 USPQ2d 1593, 1595–97 (Fed.Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987), the magistrate's conclusion on this issue is subject to our independent review. *Oahu Gas Service, Inc. v. Pacific Resources Inc.*, 838 F.2d 360 (9th Cir.1988); *see also Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 718–19, 223 USPQ 1264, 1273 (Fed.Cir. 1984).

We begin with claim 7, which includes the anti-escape baffles and a plurality of tanner panels. As to the tanner panels, they are defined in claim 7 as "a plurality of panels of netting." It was well known to use a single net panel having a steel frame, and we think the use of two or more panels to do the same task reflects no more skill than that of one of ordinary skill in the art. Indeed, it appears that the impetus for the use of a plurality of panels was that Sjolund wished to make his panels of molded plastic, and it was not feasible at that time to mold a single panel of a size large enough to cover the escapement end of a conventional trap. The limitations in claims 8–10 to panels having a rigid frame and interlocking tabs cannot serve to take Sjolund's effort outside the ken of the routineer. As to the anti-escape baffles, claim 7 depends from claim 1, wherein the baffle feature is recited simply as "a pair of baffles" positioned in a certain way. This claim language reads directly on the prior art tanner fences, which were made of nylon netting sewn into conventional traps in the same position as the "baffles" of the claim. Without hesitation, we conclude that it would have been obvious to combine

the baffles and tanner panels in a single trap. Considered as a whole, the subject matter of claims 7–10 would have been obvious to one of ordinary skill in the art at the time the invention was made.

The same result necessarily obtains with respect to claims 16–19, which, although they do not include the anti-escape baffles, are otherwise identical to claims 7–10.

Claim 13 claims the anti-escape baffles and the tanner board in combination with a conventional trap. The tanner board is defined in the claim as

a generally elongated panel having one of its longitudinal edges pivotally secured to said trap about an elongated edge of said entrance frame such that said panel may be pivoted toward said entrance frame to a partially closed position or away from said entrance frame to a full open position.

This reads directly on the prior art Johnson board. The Johnson board is "a generally elongated panel," "pivotally secured" to the trap in the manner specified. As in claim 13, the Johnson board partially obstructs the entrance frame opening in one position; in a second position, the entrance frame opening is unobstructed. As the specification of the '071 patent states, the Johnson board was one of two methods used to restrict the opening of the conventional king crab trap to convert the trap to tanner crab fishing. Given the notoriety of this method, we think it would have been obvious to any crab fisherman to install a Johnson board on a trap incorporating the other element of the combination, anti-escape baffles. The subject matter of claim 13, like that of the other claims in suit, would have been obvious to one of ordinary skill in the art.

Claim construction is the principal basis on which Sjolund's counsel attempted to support the judgment in Sjolund's favor. At oral argument, counsel stated that while the claims may appear to read on the prior art, certain key terms in the claims, such as "baffle" and "panel," are ambiguous. Counsel suggested that the jury could have construed these ambiguous terms in light of the specification in such a way that they

would distinguish over the prior art. It was suggested that the term "baffle", properly interpreted, means a *rigid* anti-escape baffle, in contrast to the flexible tanner fences made of nylon netting. And the word "panel" was said to require, when correctly construed, a tanner board of a lattice construction, unlike the Johnson board and the wooden tanner board, which are solid. In support of this argument, counsel referred to *Tandon Corp. v. U.S. International Trade Commission*, 831 F.2d 1017, 4 USPQ2d 1283 (Fed.Cir.1987). In *Tandon*, this court stated:

Claim interpretation is a question of law, having factual underpinnings. When the meaning of key terms of claims is disputed, as in this case, extrinsic evidence may be adduced including testimony of witnesses, and reference may be had to the specification, the prosecution history, prior art, and other claims.

831 F.2d at 1021, 4 USPQ2d at 1286.

We first make it clear that, in contrast to *Tandon*, this case does not involve any factual questions as to the meaning of events during the prosecution history or the meaning of extrinsic evidence adduced to aid in construing disputed claim language. Thus, there was no issue of fact for the jury. And, second, while it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims, which is plainly what counsel suggested the jury was entitled to do. The law is stated clearly in one of the cases which the court in *Tandon* relied on as authority, *SRI International v. Matsushita Electric Corp. of America*, 775 F.2d 1107, 227 USPQ 577 (Fed.Cir.1985) (in banc):

When claim construction is required, claims are construable, as above indicated, in light of the specification, *United States v. Adams*, 383 U.S. 39, 49 [86 S.Ct. 708, 713, 15 L.Ed.2d 572], 148 USPQ 479, 482 (1966), yet "[t]hat claims are interpreted in light of the specification does not mean that everything ex-

pressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d [951] at 957, 220 USPQ [592] at 597 [Fed.Cir.1985]. If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment. Nor would a basis remain for the statutory necessity that an applicant conclude his specification with "claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. It is the *claims* that measure the invention.

*SRI International,* 775 F.2d at 1121, 227 USPQ at 585. As our opinion in *SRI* makes clear, the claims define the invention.

■ For the reasons expressed in *SRI*, the general principle is that limitations from the specification are not to be read into the claims. We see nothing which would justify a departure from that principle in this case. Thus, if the jury did construe the word "baffle" to require a rigid design, and the word "panel" to require a panel of a latticed construction, it erred as a matter of law. The judgment simply cannot be supported on the basis suggested by counsel.

■ A final point we consider is the objective evidence of nonobviousness. The argument was made that Sjolund's tanner board, which counsel referred to as a "lattice board," satisfied a long felt need in the crab fishing industry. In this regard, there was evidence that wooden tanner boards were unsatisfactory because they were often jarred loose from traps when the traps were launched. The Johnson or "V" board suffered from a similar defect; it was brittle and would sometimes break at the vertex upon impact with the water. Additionally, both boards were solid and there was evidence that they could act as rudders on sinking traps, making it difficult to place the traps in a specific spot on the ocean floor. It was asserted that Sjolund's board, with its lattice or open construction, avoided these pitfalls and satisfied a long felt need.

It may well be that the lattice board solved all these problems and satisfied a long felt need. Indeed, in a practical sense, it may have been a very important improvement. But we are constrained, as was the jury, to consider whether the *claimed invention* satisfied a long felt need, or solved problems where others had failed. Because the lattice construction of Sjolund's tanner board is not part of his *claimed* invention, the advantages ascribed to the lattice construction are irrelevant in terms of the obviousness analysis. *In re Vamco Machine & Tool, Inc.,* 752 F.2d 1564, 1577, 224 USPQ 617, 624–25 (Fed.Cir.1985).

■ The same is true of commercial success. Commercial success is relevant only if it flows from the merits of the *claimed* invention. With regard to the lattice board, all the evidence was to the effect that its commercial popularity was due to the lattice configuration, a feature not claimed. Thus, the jury was not entitled to draw the inference that the success of these boards was due to the merits of the claimed invention. *White v. Jeffrey Mining Machinery Co.,* 723 F.2d 1553, 1559, 220 USPQ 703, 706 (Fed.Cir.1983), *cert. denied,* 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 49 (1984). Nor could the jury, from the bare evidence of units sold and gross receipts, draw the inference that the popularity of the tanner panels was due to the merits of the invention. *Cable Electric Products, Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1026–27, 226 USPQ 881, 888 (Fed.Cir. 1985); *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1150–51, 219 USPQ 857, 861 (Fed.Cir.1983).

### CONCLUSION

■ The magistrate erred in denying defendants' motion for JNOV. Claims 7–10, 13, and 16–19 of the Sjolund patent are invalid for obviousness.

REVERSED.